AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Western District of Washington

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>A Facebook account, more particularly described in<br>Attachment A | ) <br> ) <br> ) <br> ) <br> ) <br> ) |

FILED ___ LODGED
___ RECEIVED

APR 19 2018

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY _____ DEPUTY

Case No.

MJ 18-5094

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, attached hereto and incorporated by reference herein.

located in the _____ Northern _____ District of _____ California _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, attached hereto and incorporated by reference herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841(a)(1) and 846 | Distribution of and Conspiracy to Distribute Controlled Substances |

The application is based on these facts:

See Affidavit of DEA Special Agent Samuel T. Landis.

- ☑ Continued on the attached sheet.
- ☑ Delayed notice of _365_ days (give exact ending date if more than 30 days: _04/19/2019_ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Samuel T. Landis, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _4/19/18_

_____
*Judge's signature*

J. Richard Creatura, United States Magistrate Judge
*Printed name and title*

City and state: Tacoma, Washington

1 | **AFFIDAVIT**

2 | STATE OF WASHINGTON    )
3 |                                          )   ss
4 | COUNTY OF PIERCE        )

5 |        I, Samuel T. Landis, Special Agent, Drug Enforcement Administration (DEA),

6 | United States Department of Justice, being first duly sworn on oath, depose and state:

7 | <u>**MY BACKGROUND AND QUALIFICATIONS**</u>

8 |        1.      I am an "investigative or law enforcement officer of the United States"

9 | within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of

10 | the United States who is empowered by law to conduct investigations of, and to make

11 | arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

12 |        2.      I am a Special Agent with the Drug Enforcement Administration (DEA),

13 | and have been so employed since March of 2016.  I am currently assigned to the Seattle

14 | Field Division, Tacoma Resident Office.  Prior to my employment with the DEA, I was

15 | employed as a Border Patrol Agent from November 2009 to March 2016.

16 |        3.      I received formal training at the DEA Basic Agent Training Academy in

17 | Quantico, Virginia.  The 22-week training included comprehensive, formalized

18 | instruction in, among other things: basic narcotic investigations, drug identification and

19 | detection, familiarization with United States narcotics laws, financial investigations and

20 | money laundering, identification and seizure of drug-related assets, organized crime

21 | investigations, physical and electronic surveillance, and undercover operations.  In

22 | addition to Basic Agent Training, I have completed Money Laundering Training, Traps

23 | and Concealed Compartments Training, and other various courses that have familiarized

24 | me with investigations of drug trafficking organizations, methods of importation and

25 | distribution of controlled substances, and financial investigations.

26 |        4.      During the course of my law enforcement career, I have been involved in

27 | investigations of narcotics offenses, including offenses involved in this current

28 | investigation.  I have participated in criminal investigations of drug-trafficking

AFFIDAVIT OF SAMUEL T. LANIDS - 1

1   organizations (DTOs), ranging from street-level dealers to larger dealers, including

2   Mexican-based DTOs.  These investigations have included the unlawful importation,

3   possession with intent to distribute, and distribution of controlled substances; the related

4   laundering of monetary instruments; the conducting of monetary transactions involving

5   the proceeds of specified unlawful activities; and conspiracies associated with these

6   offenses.

7          5.      As noted above, prior to my employment with the DEA, I was employed

8   with the United States Border Patrol as a Border Patrol Agent for more than six years.

9   During my time as a Border Patrol Agent, I intercepted narcotics from narcotics

10  traffickers/smugglers as part of my regular duties.  Furthermore, I assisted the DEA and

11  Homeland Security Investigations with mid- and upper-level drug investigations in at

12  least fifteen cases.  My experience as a Border Patrol Agent familiarized me with the

13  methods used by narcotics traffickers/smugglers to transport narcotics to transport

14  narcotics, firearms, and bulk currency into and out of the United States.

15                              **PURPOSE OF AFFIDAVIT**

16         6.      This Affidavit is submitted in support of an application for a search warrant

17  under Title 18, United States Code, Sections 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A)

18  to require Facebook to disclose to the government records and other information in its

19  possession, pertaining to the subscriber or customer associated with the following

20  Facebook account (referred to as SUBJECT ACCOUNT 7):

21              a.      Facebook user ID gina.morris.714655, registered under the name

22  GINA MORRIS.

23         7.      All of the requested information is stored at premises owned, maintained,

24  controlled, or operated by Facebook, a social networking company headquartered in

25  Menlo Park, California.  The information to be searched is described in the following

26  paragraphs and in Attachment B.  This is the first application for a search warrant for

27  SUBJECT ACCOUNT 7 in this investigation.

28

AFFIDAVIT OF SAMUEL T. LANIDS - 2

## FACEBOOK INFORMATION STORAGE

8.  I am aware from my experience and training, and consultation with other investigators, of the following information about Facebook:

9.  Facebook owns and operates a free-access social networking website of the same name, accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

10.  Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail address(es), Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

11.  I know from speaking with other law enforcement that "cookies" are small files placed by a server (such as those used by Facebook) on a device to track the user and potentially verify a user's authentication status across multiple sites or webpages.  This cookie could be unique to a particular account (e.g., the Facebook account) or to a given device (e.g., the particular phone used to access the Facebook account).  The next time a user visits a particular site or server, the server will ask for certain cookies to see if the server has interacted with that user before.  Cookies can also be used to determine "machine cookie overlap," or multiple accounts that have been accessed by the same individual machine (e.g., two Facebook accounts that have been accessed on the same phone).  The machine cookie overlap thus allows Facebook to track accounts that are "linked" to each other because the same user account (username on a computer) on the same device accessed multiple Facebook accounts.  This can identify either multiple Facebook accounts used by the same person or used by different people

AFFIDAVIT OF SAMUEL T. LANIDS - 3

1  sharing the same user account and device.  In either case, the machine cookie overlap

2  means that the users of the linked accounts are the same person or two people in close

3  proximity to each other (by virtue of them using the same device).

4       12.    Facebook users may join one or more groups or networks to connect and

5  interact with other users who are members of the same group or network.  Facebook

6  assigns a group identification number to each group.  A Facebook user can also connect

7  directly with individual Facebook users by sending each user a "Friend Request."  If the

8  recipient of a "Friend Request" accepts the request, then the two users will become

9  "Friends" for purposes of Facebook and can exchange communications or view

10  information about each other.  Each Facebook user's account includes a list of that user's

11  "Friends" and a "News Feed," which highlights information about the user's "Friends,"

12  such as profile changes, upcoming events, and birthdays.

13       13.    Facebook users can select different levels of privacy for the

14  communications and information associated with their Facebook accounts.  By adjusting

15  these privacy settings, a Facebook user can make information available only to himself or

16  herself, to particular Facebook users, or to anyone with access to the Internet, including

17  people who are not Facebook users.  A Facebook user can also create "lists" of Facebook

18  friends to facilitate the application of these privacy settings.  Facebook accounts also

19  include other account settings that users can adjust to control, for example, the types of

20  notifications they receive from Facebook.

21       14.    Facebook users can create profiles that include photographs, lists of

22  personal interests, and other information.  Facebook users can also post "status" updates

23  about their whereabouts and actions, as well as links to videos, photographs, articles, and

24  other items available elsewhere on the Internet.  Facebook users can also post information

25  about upcoming "events," such as social occasions, by listing the event's time, location,

26  host, and guest list.  In addition, Facebook users can "check in" to particular locations or

27  add their geographic locations to their Facebook posts, thereby revealing their geographic

28  locations at particular dates and times.  A particular user's profile page also includes a

AFFIDAVIT OF SAMUEL T. LANDIS - 4

1  "Wall," which is a space where the user and his or her "Friends" can post messages,

2  attachments, and links that will typically be visible to anyone who can view the user's

3  profile.

4        15.    Facebook allows users to upload photos and videos.  It also provides users

5  the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is

6  tagged in a photo or video, he or she receives a notification of the tag and a link to see the

7  photo or video.  For Facebook's purposes, the photos and videos associated with a user's

8  account will include all photos and videos uploaded by that user that have not been

9  deleted, as well as all photos and videos uploaded by any user that have that user tagged

10  in them.

11        16.    Facebook users can exchange private messages on Facebook with other

12  users.  These messages, which are similar to e-mail messages, are sent to the recipient's

13  "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well

14  as other information.  Facebook users can also post comments on the Facebook profiles

15  of other users or on their own profiles; such comments are typically associated with a

16  specific posting or item on the profile.  In addition, Facebook has a Chat feature that

17  allows users to send and receive instant messages through Facebook.  These chat

18  communications are stored in the chat history for the account.  Facebook also has a Video

19  Calling feature, and although Facebook does not record the calls themselves, it does keep

20  records of the date of each call.

21        17.    If a Facebook user does not want to interact with another user on Facebook,

22  the first user can "block" the second user from seeing his or her account.

23        18.    Facebook has a search function that enables its users to search Facebook for

24  keywords, usernames, or pages, among other things.

25        19.    Each Facebook account has an activity log, which is a list of the user's

26  posts and other Facebook activities from the inception of the account to the present.  The

27  activity log includes stories and photos that the user has been tagged in, as well as

28  connections made through the account, such as "liking" a Facebook page or adding

AFFIDAVIT OF SAMUEL T. LANIDS - 5

1  someone as a friend.  The activity log is visible to the user but cannot be viewed by
2  people who visit the user's Facebook page.

3      20.    Facebook Notes is a blogging feature available to Facebook users, and it
4  enables users to write and post notes or personal web logs ("blogs"), or to import their
5  blogs from other services, such as Xanga, LiveJournal, and Blogger.

6      21.    In addition to the applications described above, Facebook also provides its
7  users with access to thousands of other applications on the Facebook platform.  When a
8  Facebook user accesses or uses one of these applications, an update about that the user's
9  access or use of that application may appear on the user's profile page.

10     22.    Some Facebook pages are affiliated with groups of users, rather than one
11 individual user.  Membership in the group is monitored and regulated by the
12 administrator or head of the group, who can invite new members and reject or accept
13 requests by users to enter.  Facebook can identify all users who are currently registered to
14 a particular group and can identify the administrator and/or creator of the group.
15 Facebook uses the term "Group Contact Info" to describe the contact information for the
16 group's creator and/or administrator, as well as a PDF of the current status of the group
17 profile page.

18     23.    Facebook uses the term "Neoprint" to describe an expanded view of a given
19 user profile.  The "Neoprint" for a given user can include the following information from
20 the user's profile:  profile contact information; News Feed information; status updates;
21 links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists,
22 including the friends' Facebook user identification numbers; groups and networks of
23 which the user is a member, including the groups' Facebook group identification
24 numbers; future and past event postings; rejected "Friend" requests; comments; gifts;
25 pokes; tags; and information about the user's access and use of Facebook applications.

26     24.    Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP
27 address.  These logs may contain information about the actions taken by the user ID or IP
28 address on Facebook, including information about the type of action, the date and time of

AFFIDAVIT OF SAMUEL T. LANIDS - 6

1 | the action, and the user ID and IP address associated with the action. For example, if a
2 | user views a Facebook profile, that user's IP log would reflect the fact that the user
3 | viewed the profile, and would show when and from what IP address the user did so.

4 |     25.    Social networking providers like Facebook typically retain additional
5 | information about their users' accounts, such as information about the length of service
6 | (including start date), the types of service utilized, and the means and source of any
7 | payments associated with the service (including any credit card or bank account number).
8 | In some cases, Facebook users may communicate directly with Facebook about issues
9 | relating to their accounts, such as technical problems, billing inquiries, or complaints
10 | from other users. Social networking providers like Facebook typically retain records
11 | about such communications, including records of contacts between the user and the
12 | provider's support services, as well as records of any actions taken by the provider or
13 | user as a result of the communications.

14 |     26.    Therefore, the computers of Facebook are likely to contain all the material
15 | described above, including stored electronic communications and information concerning
16 | subscribers and their use of Facebook, such as account access information, transaction
17 | information, and other account information. I believe such information is likely to
18 | constitute evidence of the drug trafficking crimes currently under investigation.

19 | **SUMMARY OF PROBABLE CAUSE**

20 |     27.    The information set forth in this Affidavit consists of information I have
21 | gathered and observed firsthand through the course of this investigation to date, as well
22 | as information relayed to me by other law enforcement personnel, my review of law
23 | enforcement reports, interviews of witnesses, and my review and analysis of toll records.
24 | Since I am submitting this Affidavit for the limited purpose of obtaining authorization to
25 | search SUBJECT ACCOUNT 7 as described herein, I have not included every fact
26 | known to me concerning this investigation. I have set forth only the facts that I believe
27 | are essential to establish the necessary foundation for the issuance of such warrant.

28 |

AFFIDAVIT OF SAMUEL T. LANIDS - 7

*Information Gathered From CS*

28.     During the month of August 2017, the Bremerton Police Department (BPD) Special Operations Group (SOG) was investigating a suspected local heroin dealer reportedly purchasing heroin from a Hispanic individual in the Snohomish and King County areas.  SOG conducted controlled buys from the local dealer, and eventually detained him/her during a traffic stop.  During the stop, detectives discovered a large amount of cash, which the dealer claimed he/she owed as a drug "front" to a Mexican drug trafficking organization (DTO).  The dealer then agreed to cooperate with law enforcement and was signed up as a Confidential Source (CS).

29.     The CS advised SOG that he/she had been selling various controlled substances for several years. According to the CS, he/she has been in contact with a group of Mexicans who sell heroin in the Puget Sound region. Within that organization, the CS connected with a prominent drug trafficker whom the CS knew as "Juan" or "Jose." The CS believes the individual he/she knew as "Juan" was the local leader of the drug distribution at that time, and was later promoted to a larger role in the DTO.

30.     BPD Detective Jordan Ejde located a Facebook account under the name of "Juan Andres CASTRO Valenzuela" (Subject Account 2) that the CS and other local suspected drug dealers were associated with.  Det. Ejde questioned the CS about the account and the CS confirmed CASTRO was the male whom he/she referred to as "Juan" or "Jose."  The CS also showed Det. Ejde messages confirming that CASTRO had been in recent contact with the CS, using Subject Account 2.  According to the CS and the Facebook data he/she provided, he/she had been talking to CASTRO via Facebook Messenger for purposes of making drug transactions since approximately June of 2016.

31.     A review of the CS's Facebook account showed CASTRO also contacted the CS from additional Facebook accounts under the names of "REBECA SPENCER" (Subject Account 5), "ANNEL BAKER" (Subject Account 4), and "KATHERINE THOMAS" (Subject Account 1).  A review of the CS's phone showed CASTRO also used Mexican phone numbers 52-668-199-4039, 52-668-248-4230, 52-668-225-5890,

AFFIDAVIT OF SAMUEL T. LANIDS - 8

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

and 52-668-199-5533 to communicate with the CS via text message and voice calls. Subject Account 1 and phone number 52-668-199-4039 were CASTRO's most current methods of drug related communications with the CS (at that time).

32.     Det. Ejde and Special Agent (SA) Anthony DelVecchio have confirmed CASTRO's identity via the Washington State Department of Licensing (WADOL). Specifically, CASTRO's WADOL photograph matches that of the individual on Subject Account 2. Furthermore, according to a law enforcement database, CASTRO was involved as a suspected "cell head" for heroin distribution in the Everett area during a DEA investigation that took place in 2012. SA DelVecchio researched this prior DEA case and found that CASTRO was, in fact, the primary target of investigation within that case.

33.     Based on how CASTRO first interacted with the CS, I believe CASTRO used Subject Account 2 for initially contacting his suspected drug customers. When CASTRO first contacted the CS via Facebook Messenger, he used Subject Account 2. After a brief introduction utilizing Subject Account 2, CASTRO switched over to a more discrete account(s), e.g., Subject Account 4 and/or Subject Account 5, for the actual organizing of the suspected drug transactions. I believe that by having a picture of himself [CASTRO] as the account user for Subject Account 2, it helped his customers recognize him in addition to him building a rapport with them.

34.     CASTRO has used Subject Account 1, Subject Account 2, Subject Account 4, Subject Account 5, and Subject Account 6, as well as various telephone numbers, to set up drug deals with the CS. According to the CS, CASTRO typically arranges the transaction, but sends a Hispanic male to conduct the transaction with the CS. The CS explained that he/she has met several different Hispanic males across the Puget Sound region to conduct these drug transactions. The CS told law enforcement that he/she typically purchased 1-2 ounces of heroin several times per week.

35.     Recently, after talking to CASTRO and arranging for a heroin purchase, the CS met with a Hispanic male the CS knows as "Miguel." Investigators identified

AFFIDAVIT OF SAMUEL T. LANIDS - 9

1  "Miguel" as Jesus Rene SARMIENTO Valenzuela by comparing surveillance

2  photographs of CASTRO DTO members, SARMIENTO's Facebook account, and his

3  visa information from the United States Department of Homeland Security.

4       36.    Utilizing the CS, SOG has conducted seven controlled purchases of

5  suspected heroin from CASTRO through SARMIENTO, totaling approximately 90.4

6  grams.[1] Prior to and after each controlled purchase of heroin, detectives searched the CS

7  and his/her vehicle, and provided the CS with pre-recorded SOG funds to make each

8  purchase of heroin. During the course of each controlled purchase, investigators

9  maintained surveillance on the CS. After each purchase, detectives tested the suspected

10  heroin using a NIK test kit with presumptive positive results for the presence of heroin,

11  and then processed the heroin according to SOG's policies and procedures. For the

12  second through sixth controlled purchases, detectives recorded the buys with a covert

13  surveillance camera.

14  ***Undercover Controlled Purchase #1 Utilizing Subject Account 1***

15       37.    In early November 2017, SOG provided DEA agents, including an

16  undercover agent (the UC) with the various phone numbers and Facebook accounts they

17  believed CASTRO and SARMIENTO used for drug trafficking purposes.

18       38.    On November 14, 2017, the CS sent the UC an invitation to join a group

19  Facebook Messenger chat session, which linked the UC in communication with Subject

20  Account 1. The following is a transcript of the discussion between CASTRO and the

21  UC. During the conversation, the UC used the terms "brown" and "piece." From

22  training and experience, agents know heroin to be referred to as "brown" and an ounce to

23  be referred to as "piece." These terms are common language within the drug community,

24  and in order to appear knowledgeable and experienced, the UC used them.

25      &bull;    UC: "Hello fellas, appreciate the intro"

26

---

27  [1] The first six controlled buys performed by SOG totaled approximately 90.4 grams of suspected heroin. The

28  seventh buy SOG conducted was done in conjunction with DEA. 46.2 gross grams of suspected heroin was seized during this seventh purchase, for a total of 136.6 gross grams between the first seven controlled purchases from this DTO.

AFFIDAVIT OF SAMUEL T. LANIDS - 10

- CASTRO: "How are you?"
- UC: "Besides all the rain, everything is good. Yourself"
- CASTRO: "good..."
- UC: "Up for some business this week?"
- CASTRO: [Thumbs up graphic]
- UC: "I'd like two pieces of brown, what would that cost"
- CASTRO: "look, 1 is $1150...but if you want buy 2 or 3 is $1075...if you buy 4 or more is $1,025"
- UC: "I want 2. Can we do it Thursday?"
- CASTRO: "ok"
- CASTRO: "yes"
- UC: "Where do you want me to go?"
- CASTRO: "Kent, maybe Tacoma..."
- UC: "OK"

39.     On November 16, 2017, agents conducted an undercover purchase of heroin from SARMIENTO at the Krispy Kreme at 4302 Tacoma Mall Boulevard, Tacoma, Washington.  The UC contacted CASTRO on 52-668-199-4039 (Target Telephone 1 or TT1) and through Subject Account 1 prior to this transaction in order to facilitate the meeting.  The UC also contacted SARMIENTO on his telephone, 253-398-5638 (Target Telephone 3 or TT3), prior to and during this transaction.  The following conversations are noteworthy communications leading up to the controlled purchase of heroin from CASTRO through SARMIENTO, and include what I believe to be pertinent interactions with SARMIENTO (known to the UC as "Miguel"), to include statements SARMIENTO made to the UC during the undercover purchase on November 16, 2017, obtained through the UC's use of an electronic monitoring device that recorded the audible interactions between the UC and SARMIENTO.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

40.     From 10:24 a.m. to 10:31 a.m., the UC and CASTRO, using Subject Account 1, had the following Facebook messenger conversation:

- CASTRO: "send me you phone number please"
- UC: "No problem, 360-362-8770"
- CASTRO: "ok...I will send text to you"
- UC: "Sounds good"

41.     At 10:36 a.m., the UC received a text message from TT1.  Between 10:36 a.m. and 11:16 a.m., the UC and CASTRO had the following text message conversation:

- CASTRO: "I'm in way to camp with my family, my phone service will be very bad at next hour to tomorrow..."
- CASTRO: "if you need something send text to my cousin Miguel please...253-398-5638"
- UC: "Got it thanks enjoy the camping trip amigo"
- UC: "I'll text him today for sure"
- UC: "Will your guy still be able to get me the 2 today?"
- CASTRO: "Hey"
- UC: "Hey, just asking if your guy can still do 2 today?"
- CASTRO: "What number are you sending me messages from?"
- CASTRO: "but yes, he is ready for you"
- UC: "I'm sending messages from my cell"

42.     At 11:15 a.m., the UC texted "Miguel" at TT3.  From 11:15 a.m. to 11:35 a.m., the UC and "Miguel" had the following text message conversation:

- UC: "Hey Miguel, this is Steve. I was told to talk to you about doing some business today. Are you good for 2 this afternoon?"
- Miguel: "Yes ok"
- Miguel: "Good"
- Miguel: "at that time are you come by the material"

AFFIDAVIT OF SAMUEL T. LANIDS - 12

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1      • UC: "I don't know what time I'll be up there, but can I get 2?"

2      • Miguel: "Ok"

3      • Miguel: "I can post-1 p.m."

4      • UC: "Good"

5      43.      From 1:24 p.m. to 1:42 p.m., the UC and "Miguel" had the following

6  conversation via text message:

7      • Miguel: "Where are you"

8      • UC: "I'm in Olympia, you want to meet in Tacoma?"

9      • Miguel: "Its ok"

10     • UC: "Do you know where the mall is? I can go there easy."

11     • Miguel: "How long you are there"

12     • Miguel: "Yes in Tacoma mall ok"

13     • UC: "30 minutes"

14     • UC: "Meet at the Krispy Kreme?"

15     • Miguel: "My gps tell 50 min its ok mh friend"

16     • UC: "Sure amigo, that's ok"

17     44.      About an hour later, the UC arrived at 4302 Tacoma Mall Boulevard,

18  Tacoma, Washington (the Krispy Kreme address), and parked facing south.  At 2:33

19  p.m., "Miguel" texted the UC that, "In 10 min im, there."  Between 2:36 p.m. and 2:41

20  p.m., the UC and "Miguel" had the following conversation via text message:

21     • UC: "I am parked in a truck at the place"

22     • Miguel: "What is your car"

23     • UC: "Blue Ford F-150"

24     • Miguel: "Ok"

25     • Miguel: "I have red car getta"

26     • Miguel: "Red car"

27     • Miguel: "In 2 min"

28

AFFIDAVIT OF SAMUEL T. LANIDS - 13

1       •    UC: "Ok"

2      45.     Minutes later, the UC observed a red Volkswagen Jetta drive into the

3 Krispy Kreme and park nearby. A Hispanic male, mid-thirties, with a beard and dark

4 sweatshirt, motioned for the UC to get into the Jetta. The UC acknowledged, exited his

5 vehicle, and got into the Jetta's front passenger seat. The Hispanic male introduced

6 himself as "Miguel," the UC introduced himself as "Steve," and the men shook hands.

7 They made small talk about the bad traffic in the area, and then "Miguel" asked the UC if

8 the deal was for "two pieces." The UC nodded his head and handed "Miguel" $2,150 in

9 buy money.

10      46.     The UC watched "Miguel" count the money, and confirmed the total

11 amount of $2,150. "Miguel" gave the UC a plastic baggie that contained suspected

12 heroin. Shortly thereafter, "Miguel" nodded toward the door and told the UC that he

13 would "see him next time." Agents transported the suspected heroin to the DEA Tacoma

14 Resident Office where it was weighed at approximately 87.4 gross grams.

15 ***Undercover Controlled Purchase #2 Utilizing Subject Account 1***

16      47.     On November 27, 2017, the UC received a text message from CASTRO

17 (TT1). During this conversation, the UC and CASTRO discussed a future drug

18 transaction that would later occur on November 30, 2017. The UC said, "I am trying to

19 get money together for 4…," meaning he wanted to purchase four ounces of heroin. The

20 UC and CASTRO (TT1) had the following text message conversation:

21       •    CASTRO: "amigo, everything it's ok?"

22       •    UC: "Amigo, everything is good here. Just got back home. How are you

23             doing? This is Steve"

24       •    CASTRO: "ok…"

25       •    UC: "Can we do business Thursday?"

26       •    CASTRO: "yes"

27       •    UC: "Excellent!"

28

AFFIDAVIT OF SAMUEL T. LANIDS - 14

1   • UC: "I am trying to get money together for 4, would that be ok?"

2   • CASTRO: "ok"

3   • UC: "Cool!"

4   • UC: "Anymore camping trips planned amigo?"

5   48.   On November 30, 2017, agents conducted an undercover purchase of

6   heroin from CASTRO, through SARMIENTO, at the Buffalo Wild Wings at 2005 South

7   320th Street, Federal Way, Washington.  The following are noteworthy communications

8   between the UC and CASTRO while setting up the second controlled purchase, and the

9   UC's interactions with SARMIENTO, to include statements SARMIENTO made to the

10  UC during the undercover purchase on November 30, 2017, obtained through the UC's

11  use of an electronic monitoring device that recorded the audible interactions between the

12  UC and SARMIENTO.

13  49.   At 1:01 p.m., the UC initiated a Facebook Messenger conversation with

14  CASTRO through Subject Account 1. The following transcript reflects the discussion

15  between 1:01 p.m. and 1:26 p.m.:

16  • UC: "Hey Amigo, I was able to get the money. Are we still good for 4

17     today?"

18  • CASTRO: "yes"

19  • UC: "Very nice, should I contact Miguel like last time?"

20  • CASTRO: "yes, or to me..."

21  • UC: "Ok, where would you like me to go?"

22  • CASTRO: "Deppend what time you can go"

23  • CASTRO: "where you live?"

24  • UC: "I live near Olympia, south of Tacoma"

25  • CASTRO: "ok"

26  • UC: "I can get to Tacoma Mall like last time. What do you think?"

27  • CASTRO: "what time?"

28

AFFIDAVIT OF SAMUEL T. LANIDS - 15

1    • UC: "2:30?"

2    • CASTRO: "2:30 you will leave? or 2:30 you will be at Tacoma?"

3    • UC: "I will be at Tacoma"

4    • CASTRO: "Ok, go"

5    • UC: "Ok"

6    50.    Using Subject Account 1, CASTRO told the UC that he changed the meet

7    location from the Tacoma Mall to the Buffalo Wild Wings at 2005 South 320th Street,

8    Federal Way, Washington 98003.  The following conversation from 2:44 p.m. to 2:46

9    p.m. includes the location change and subsequent acknowledgement by the UC:

10   • CASTRO: "2005 South 320th Street, Federal Way, WA 98003, EE. UU.[2]

11       is a Buffalo wild wings"

12   • CASTRO: "please go there"

13   • UC: "Ok amigo, headed that way"

14   51.    From 2:59 p.m. to 3:43 p.m., the UC and CASTRO, using Subject Account

15   1, had the following conversation via Facebook messenger:

16   • CASTRO: "how long you will be there?"

17   • UC: "15 minutes"

18   • CASTRO: "ok"

19   • CASTRO: "You're driving same car?"

20   • UC: "Yes"

21   • UC: "Same car for you?"

22   • CASTRO: "same too"

23   • CASTRO: "my cousin is there waiting for you"

24   • UC: "Ok, good. I'll hurry up."

25   • CASTRO: "how long?"

26

27   _____

28   [2] I know that "EE. UU." is a Spanish-language abbreviation for "Los Estados Unidos," i.e., the United States.

AFFIDAVIT OF SAMUEL T. LANIDS - 16

- CASTRO: "??"
- UC: "5 minutes"
- CASTRO: "ok"
- UC: "Where is he parked at Buffalo Wild Wings?"
- CASTRO: "yes, just front at mall door."
- UC: "ok"
- CASTRO: "you're there??"
- CASTRO: "??"
- UC: "yes, off the exit and am there."
- CASTRO: "ok ok"
- CASTRO: "hey what's happening??"
- UC: "I'm there"
- CASTRO: "ok"
- CASTRO: "where you are parked?"

52.    The UC then drove into the parking area of the Buffalo Wild Wings, and parked. The UC received two calls from CASTRO. Of note, Facebook Messenger has telephone call capabilities as well as video chat. The first phone call came through Facebook Messenger under Subject Account 1, and the second call came from TT1. The UC ignored the calls and asked CASTRO, through Subject Account 1, "where is he?" CASTRO responded that his cousin was "walking to the car."

53.    Moments later, the UC identified SARMIENTO walking towards the UC's vehicle. SARMIENTO was wearing a black baseball cap, dark jacket and sweater, with black pants. The UC watched SARMIENTO move alongside the passenger side of the vehicle, and enter the front passenger seat. The UC took $4,100 in buy money, wrapped in a plastic bag, from his sweatshirt pocket, and gave it to SARMIENTO, who began counting it. During his count, the UC asked SARMIENTO what he had done over the holiday. SARMIENTO smiled, and responded that he had partied with friends at the

AFFIDAVIT OF SAMUEL T. LANIDS - 17

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  "store." The UC asked if he worked at the "store," and SARMIENTO said that he did.

2  Once SARMIENTO finished counting, he looked at the UC and stated, "$4,300?" The

3  UC responded "$4,100," to which SARMIENTO nodded his head.

4      54.    SARMIENTO then motioned with his hand to drive forward. The UC

5  nodded and began to drive slowly through the parking lot until SARMIENTO told the

6  UC to stop. SARMIENTO then reached near his waist and took out a brown bundle of

7  suspected heroin, tightly wrapped in plastic. SARMIENTO placed the brown bundle in

8  the plastic bag the money had previously been in and then left it on the floor near the

9  middle console of the vehicle. SARMIENTO and the UC parted ways after the

10  exchange. Agents transported the suspected heroin to the TRO where it was weighed at

11  approximately 136.1 gross grams.

12      55.    Shortly after the UC and SARMIENTO parted ways, CASTRO sent a large

13  "thumbs up" graphic to the UC via Subject Account 1, indicating a successful drug

14  transaction.

15      56.    Later that afternoon, the UC attempted to call Subject Account 1.

16  CASTRO did not answer the call, but instead initiated a text conversation through

17  Subject Account 1 that lasted from 5:14 p.m. to 5:26 p.m. The following transcript

18  reflects this conversation:

19      •    CASTRO: "what's up??"

20      •    UC: "Nothing important, just appreciate your cousin finding me today. It

21          was good"

22      •    CASTRO: [Thumbs up graphic]

23  ***Undercover Controlled Purchase #3 Utilizing Subject Account 1***

24      57.    On December 15, 2017, at 11:16 a.m., the UC attempted to call CASTRO

25  via SUBJECT ACCOUNT 1 on Facebook Messenger. CASTRO did not answer the call,

26  but typed a response at 11:17 a.m. The following transcript reflects the ensuing

27  conversation between 11:17 a.m. to 12:34 p.m.:

28      •    CASTRO: "hey, what's up?"

AFFIDAVIT OF SAMUEL T. LANIDS - 18

- UC: "hey amigo, can we do some business"
- CASTRO: "yes..."
- UC: "I'd like to get some powder today, probably 2 for customers in Ohio. I'm going there to visit family for the holidays."
- CASTRO: "only powder??"
- UC: "Yes, it's what they asked for. What is the price difference?"
- UC: "They like brown powder out there"
- CASTRO: "its ok"
- CASTRO: "what time you think that will go??"
- UC: "I'm ready now. Where do you want me to go?"
- CASTRO: "same place"
- UC: "Buffalo Wild Wings?"
- CASTRO: "please go to North, maybe at Kent...I will send address when you are at 20 minutes away"
- UC: "ok amigo"
- UC: "same price for 2?"
- CASTRO: "yes, $2,150"
- UC: "ok"
- CASTRO: "you're on way??"
- UC: "yes"
- CASTRO: [Thumbs up graphic]

58.    At approximately 12:50 p.m., the UC called TT1.  CASTRO answered the call and asked, "Who is this?"  The UC identified himself, and informed CASTRO that he was 20 minutes away.  CASTRO responded, "Send text please," and terminated the call.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

59.    At 12:53 p.m., the UC reinitiated the Facebook Messenger conversation with CASTRO on Subject Account 1.  The following transcript reflects the discussion between 12:53 p.m. to 1:02 p.m.:

- UC: "I am 20 minutes away"
- CASTRO: "ok, you called me?"
- UC: "Yes, I couldn't text while driving."
- UC: "Where do you want me to go?"
- CASTRO: "26301 104th Avenue SE, Kent, Washington 98030, EE. UU."
- CASTRO: "is a target"
- CASTRO: "let me know when you are at 10 minutes away"
- UC: "Ok, on my way"
- CASTRO: "how long you will be there?"
- UC: "25 minutes, traffic is bad."
- CASTRO: "Ok, let me know when you are at 10 minutes away please"
- UC: "Ok"

60.    From 1:24 p.m. to 1:26 p.m., the UC and CASTRO had the following conversation via Subject Account 1:

- CASTRO: "you're close??"
- UC: "Yes, about 10 minutes"
- CASTRO: "Ok"

61.    At approximately 1:35 p.m., the UC pulled into the Target store at 26301 104th Avenue SE, Kent, Washington and parked.  At 1:37 p.m., the UC informed CASTRO via Subject Account 1 that he was "at the Target, parked near Target sign in parking lot, same vehicle."

62.    At approximately 1:45 p.m., the UC observed a red 2008 Volkswagen Jetta, bearing Washington license BFX7429 (Target Vehicle 1 or TV1) pull up and park next to him.  The UC exited his vehicle, got into (TV1's) front passenger seat, and greeted

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

SARMIENTO.  SARMIENTO acknowledged the UC, shook his hand, and produced a small brown bundle wrapped tightly in plastic.  The UC took the bundle, thanked SARMIENTO, and handed him $2150 in buy money.  SARMIENTO put the money in his pocket without counting, and signaled the UC to leave.  The UC indicated SARMIENTO could count the money, but SARMIENTO stated that he "trusted the UC," and they bumped fists as the UC was exiting the vehicle.

63.     At 1:54 p.m., CASTRO sent a large "thumbs up" graphic to the UC via Subject Account 1 on Facebook messenger.

64.     At 4:22 p.m., the UC attempted to call CASTRO using Subject Account 1. CASTRO did not pick up the call, but typed a response at 4:23 p.m.  The following transcript reflects the conversation through Subject Account 1 from 4:23 p.m. to 4:24 p.m.:

- CASTRO: "what's up??"
- UC: "Sorry amigo, pushed the wrong button. Just wanted to say everything went well. Good deal."
- CASTRO: [thumbs up graphic]

*Federal Search Warrant for Subject Account 1*

65.     On January 3, 2018, I obtained a search warrant from the United States District Court for the Western District of Washington for Subject Account 1, believed to be used by CASTRO in order to network and facilitate suspected drug transactions.  On January 17, 2018, during a search of the Facebook Messenger portion of the returned warrant materials, I found numerous suspected drug conversations between CASTRO and individuals whom agents believe are his drug customers.

66.     One of the conversations on Facebook Messenger/ Subject Account 1 showed CASTRO and a suspected drug distributor under the Facebook account "ALEX HUBLY" organizing a suspected drug transaction on December 29, 2017.  During one of the conversations between the two, CASTRO told HUBLY that he would send his cousin

AFFIDAVIT OF SAMUEL T. LANIDS - 21

1  who would be driving a "gray Civic."[3]  The following is a transcript of the

2  aforementioned conversation between CASTRO and the ALEX HUBLY account from

3  5:58 p.m. to 7:35 p.m.:

4  • HUBLY: "will you be ready tonight?"

5  • CASTRO: "yes ill be ready in like 25 min"

6  • CASTRO: "My cousin will start your way to puyallup at next 10 minutes"

7  • HUBLY: "Ok I will have all the money by like 6 50.."

8  • CASTRO: "how many money you think that will have??"

9  • HUBLY: "I will have 1700"

10  • HUBLY: "I'm in puyallup"

11  • CASTRO: "for sure??"

12  • HUBLY: "How did you know I was in Puyallup?"

13  • CASTRO: "my cousin will go to puyallup with other client?"

14  • CASTRO: "1700 for sure??"

15  • CASTRO: "??"

16  • HUBLY: "Yes for sure for sure"

17  • CASTRO: "ok"

18  • HUBLY: "didnt know there was someone else that had product in Puyallup

19  what is there bane."

20  • HUBLY: "There name**"

21  • HUBLY: "And will you make sure it is the same good stuff he has givin

22  me the last 2 times please"

23  • CASTRO: "yes, will be the same, I promise"

24  • HUBLY: "K"

---

[3] a.  Agents later identified the vehicle (Target Vehicle 2, or TV2) as a 2004 grey Honda Civic, bearing Washington license plate BEX3964 and vehicle identification number (VIN) JHMES96664S021704. I believe Octavio COTA Lopez, a suspected drug distributor for the CASTRO DTO, is the user of TV2. On February 5, 2018, United States Magistrate Judge J. Richard Creatura authorized the GPS tracking of TV2 for a 45-day period.

AFFIDAVIT OF SAMUEL T. LANIDS - 22

1        •   HUBLY: "How long"

2        •   CASTRO: "send me you address please"

3        •   HUBLY: "2101 N Meridian, Puyallup, WA 98371"

4        •   HUBLY: "I need him asap"

5        •   CASTRO: "room # ??"

6        •   HUBLY: "Its room 225 but I have to meet him outside cause you can't get

7            in without a card"

8        •   CASTRO: "ok.. he says 25 minutes will be there"

9        •   HUBLY: "Tell him to park on the side closest to the car dealership"

10       •   HUBLY: "ok"

11       •   CASTRO: "8 minutes, he is driving a gray Civic"

12       •   HUBLY: "ok"

13       •   HUBLY: "Park in back corner"

14       •   CASTRO: "ok"

15       •   CASTRO: "Text when he is here"

16       •   HUBLY: "gray Civic"

17       •   CASTRO: "he is there"

18       •   CASTRO: "close to the dealership"

19       •   CASTRO: "he is Parker between at with Ford truck and blue GMC truck"

20       •   HUBLY: "Found him"

21       •   CASTRO: [Thumbs up graphic]

22       67.    During this conversation, I believe CASTRO and HUBLY arranged a drug

23  transaction.  Specifically, I believe HUBLY purchased $1,700 worth of high purity

24  heroin (likely a piece-and-a-half) from CASTRO and CASTRO sent Arturo FRIAS

25  Cabellos (aka "Luis") and/or Octavio COTA Lopez in TV2 to deliver the drugs to

26  HUBLY at his referenced address in Puyallup, Washington.  Agents have previously

27  identified FRIAS and COTA as suspected drug couriers for the CASTRO DTO.  I believe

28

AFFIDAVIT OF SAMUEL T. LANIDS - 23

1    CASTRO was specific in describing TV2 on two separate occasions because HUBLY

2    had typically done business with CASTRO's subordinates in a different vehicle, i.e.,

3    TV1.  I believe CASTRO described TV2 to HUBLY in order to make sure HUBLY

4    identified the correct vehicle in the parking lot.  The last message HUBLY sent to

5    CASTRO, as noted above ("Found him"), was sent at just about 7:35 p.m.  Examination

6    of mounted surveillance camera footage at 22025 100th Avenue Southeast (a suspected

7    DTO stash house) from December 29, 2017, showed TV2 returned to 22025 100th

8    Avenue Southeast at approximately 8:20 p.m.  Agents believe TV2's arrival at this

9    suspected CASTRO DTO stash house (and residence for FRIAS and COTA) was

10   consistent with the driver of TV2 having taken no more than ten minutes to conduct the

11   transaction with HUBLY in Puyallup, Washington, and then drove back to Kent,

12   Washington.  This belief is based on agents' knowledge of typical drug transactions

13   (including transactions specifically with this DTO) in conjunction with general travel

14   times and traffic patterns between Kent and Puyallup during Friday evenings (like

15   December 29, 2017).

16          68.    During a search of the "Cookies" portion of Subject Account 1, I found

17   Subject Account 3 and Subject Account 4 listed as accounts linked to Subject Account 1.

18   On February 27, 2018, I contacted Facebook Support and asked how the accounts were

19   linked to each other based on the data they provided.  Facebook Support staff informed

20   me that Subject Account 1, Subject Account 3, and Subject Account 4 were all accessed

21   by the same electronic device (one that is capable of accessing the World Wide Web) and

22   under the same "cookie."  A "cookie" is a personal identifier for a specific browser that

23   links to particular web portal.  This means CASTRO is using the same electronic device

24   to access Subject Account 1, Subject Account 3, and Subject Account 4.  The electronic

25   device CASTRO uses remembers his web signature or "cookie" by storing his unique

26   web browsing on Facebook.  Anytime CASRTO reuses the same electronic device to

27   browse the web, e.g., Facebook, the device remembers his web identifiers for him.

28

AFFIDAVIT OF SAMUEL T. LANIDS - 24

1      69.    As mentioned before, agents know CASTRO to use Subject Account 4 for

2 the purposes of facilitating suspected drug trafficking based on past conversations with

3 the CS.  On multiple occasions, the CS has communicated with Subject Account 4 in

4 order to place suspected drug orders through CASTRO.

5      70.    CASTRO has used Subject Account 1, Subject Account 2, Subject Account

6 4, Subject Account 5, and Subject Account 6 for the purposes of organizing suspected

7 drug transactions.  I believe he utilizes multiple accounts for his suspected drug

8 enterprise, to include Subject Account 3, in order to avoid detection by law enforcement.

9 I believe this to be true because it is common for drug traffickers to avoid using the same

10 electronic device and/or personal electronic profile for extended periods, in hopes of

11 avoiding law enforcement.

12      71.    While comparing the friends lists of Subject Account 1 through 6, I found

13 that Subject Account 1, Subject Account 4, and Subject Account 5 all had common

14 friends.  The "friends list" portion of Facebook is a list of other Facebook accounts

15 known to a specific account.  This allows users to set up communications easier.  Among

16 some of the friends in common between the Subject Account 1, 4 and 5, at least seven

17 friends have been in communication with CASTRO via Subject Account 1 for the

18 purposes of organizing suspected drug transactions.  Since CASTRO has a core group of

19 contacts logged, he is easily able to reach out to any of his suspected drug customers

20 from any of his Facebook account(s), which I believed included Subject Account 3.

21 ***Undercover Controlled Purchase #4 Utilizing Subject Account 1***

22      72.    On January 14, 2018, at 3:41 p.m., the UC sent a message to CASTRO via

23 Subject Account 1 on Facebook Messenger after unsuccessful attempts to speak with

24 FRIAS (aka "Luis") on the phone.  CASTRO had previously instructed the UC to talk to

25 FRIAS if he needed anything, providing number 206-698-1965 (Target Telephone 4 or

26 TT4) as FRIAS' contact information.  Between 3:41 p.m. to 3:48 p.m., the UC and

27 CASTRO had the following Facebook Messenger conversation via Subject Account 1:

28      •    UC: "Hey amigo, are you around?"

AFFIDAVIT OF SAMUEL T. LANIDS - 25

1    • CASTRO: "Kent"

2    • UC: "I will be back in town later this week. I tried to call "Luis" about

3      business, he didn't know me. Was it the right number?"

4    • CASTRO: "yes"

5    • CASTRO: "2066981965"

6    • UC: "Well he told me I had the wrong number. Did you tell him I might

7      call?"

8    • CASTRO: "yes, but if you need something will send text to me"

9    • UC: "Ok, that works"

10   73.    On January 23, 2018, at 1:45 p.m., the UC initiated a Facebook Messenger

11   conversation with CASTRO on Subject Account 1.  The following transcript reflects the

12   discussion between 1:45 p.m. to 2:11 p.m.:

13   • UC: "Hey amigo, is everything good?"

14   • CASTRO: "yes, how are you?"

15   • UC: "I was worried after last phone call. Can you do some business today?"

16   • CASTRO: "yes"

17   • UC: "Can I get 2 of the brown powder, like last time?"

18   • CASTRO: "yes"

19   • UC: "I am in Tacoma, where would you like me to go?"

20   • CASTRO: "one second please"

21   • UC: "ok"

22   • CASTRO: "how much money you pais las time?"

23   • UC: "2150"

24   • CASTRO: "ok"

25   • CASTRO: "how long you will be at Auburn super mall?"

26   • UC: "20 minutes"

27   • CASTRO: "ok, go there please"

28

AFFIDAVIT OF SAMUEL T. LANIDS - 26

- CASTRO: "you will meet with my friend...my cousin is at California now."
- UC: "Ok, is your friend driving the same car?"
- CASTRO: "yes, red Jetta...my cousin will return next week"
- UC: "Sounds good amigo. Glad your cousin is safe."

74.    Between 2:16 p.m. to 2:41 p.m., the UC and CASTRO had the following conversation via Facebook messenger on Subject Account 1:

- UC: "Amigo, my customers are asking about fentinil pills, something like oxy. Have you heard of this? Can you get them?
- CASTRO: "I know someone who has that, but he lives in Marysville far away...maybe next time."
- CASTRO: "Did you know anything about shawn SHAPUTIS?"
- CASTRO: "him not answer me 1 month ago"
- UC: "I know Shawn. I haven't talked to him, but heard he is in treatment doing well. Before he left for treatment, I think he was living in his car."
- CASTRO: "ok...You have a phone number??"
- UC: "360-362-8770"

75.    From 2:43 p.m. to 3:22 p.m., the UC and CASTRO had the following conversation via Facebook messenger on Subject Account 1:

- CASTRO: "you're at super mall now?"
- CASTRO: "my friend will be at 8 minutes"
- UC: "I'm close, traffic is bad. Probably 10 minutes."
- UC: "Is it your friend Luis meeting me?"
- CASTRO: "yes, Luis"
- UC: "ok"
- CASTRO: "what car are you driving?"
- UC: "Same car, F-150"
- UC: "Needs a paint job, got hit in accident."

AFFIDAVIT OF SAMUEL T. LANIDS - 27

1     •   CASTRO: "is red color the f-150"

2     •   UC: "No, blue"

3     •   CASTRO: "ok, he is there...how long?"

4     •   CASTRO: "??"

5     76.   At 3:01 p.m., CASTRO made Facebook messenger phone call, which the

6  UC did not answer. CASTRO then sent the following text message over Facebook

7  Messenger text via Subject Account 1 to the UC: "??"

8     77.   At 3:02 p.m., the UC made a Facebook messenger phone call, which

9  CASTRO did not answer.  Instead, CASTRO replied on Facebook Messenger text via

10  Subject Account 1:

11     •   CASTRO: "you're there?"

12     •   CASTRO: "hey"

13     •   CASTRO: "where you are?"

14     •   UC: "Hey, I am here. Where is he?"

15     •   CASTRO: "is parked front Burlington coat factory"

16     •   CASTRO: "hey"

17     •   CASTRO: "he is waiting for you"

18     •   UC: "Ok, I am driving there now."

19     •   CASTRO: "how long?"

20     •   UC: "5 minutes, where is he by Burlington?"

21     •   CASTRO: "yes"

22     •   UC: "I tried calling he didn't answer"

23     •   CASTRO: "him have a new phone number"

24     •   CASTRO: "go to front Burlington"

25     •   UC: "Ok, I am at Burlington, he is in front?"

26     •   CASTRO: "Yes"

27     •   CASTRO: "parked"

28

AFFIDAVIT OF SAMUEL T. LANIDS - 28

1

2

3

4

5

- CASTRO: "him see to you. go back please"
- UC: "I parked, does he see me?"
- CASTRO: "is on your right side"
- UC: "Behind me?"
- CASTRO: "right side"

6    78.    At approximately 3:25 p.m., the UC saw TV1 near the entrance to the

7   Burlington Coat Factory store.  After parking next to TV1, the UC got inside TV1, which

8   was occupied by a Hispanic male who introduced himself as "Luis."  The two spoke

9   about non-drug related topics before FRIAS ("Luis") received a phone call.

10    79.    At approximately 3:30 p.m., the UC saw FRIAS answer his phone.  The

11   call was believed to be confirmation between CASTRO and FRIAS that the suspected

12   drug transaction was underway.  After terminating the call, FRIAS told the UC that it was

13   his "cousin," who agents believe to be CASTRO.  The UC acknowledged, and signaled

14   to FRIAS to make the suspected drug exchange.  The UC gave FRIAS $2150 in buy

15   money and in return, FRIAS gave the UC suspected heroin wrapped in plastic.

16   Afterwards, the two agreed to meet again in the future and then parted ways.

17    80.    At 5:17 p.m., the UC reinitiated the Facebook Messenger conversation with

18   Subject Account 1.  The following transcript reflects the discussion from 5:17 p.m. to

19   5:20 p.m.

20

21

- UC: "No 'thumbs up' amigo? Lol, I look for it after doing business with ya. Seriously, everything went great with Luis, good deal"

22

23

- CASTRO: [Thumbs up graphic]
- UC: "haha, thanks"

24   ***CASTRO Uses Subject Account 6 to Contact the CS***

25    81.    In February 2018, CASTRO contacted the CS utilizing the Facebook

26   profile "ALISSA KEYSER" (Subject Account 6).  During the conversation, CASTRO

27   greeted the CS, as he normally would when organizing a suspected drug transaction with

28

AFFIDAVIT OF SAMUEL T. LANIDS - 29

1   the CS.  The CS replied to CASTRO by saying that he/she was no longer interested in

2   buying drugs.  CASTRO subsequently acknowledged and ended the brief conversation.

3   Based on how the CS organized suspected drug transactions with CASTRO in the past,

4   how CASTRO abruptly ended the conversation after the CS stated that he/she was not

5   interested in drugs, and how CASTRO utilizes multiple Facebook accounts for the

6   purposes of organizing drug transactions, I believe CASTRO contacted the CS using

7   Subject Account 6 for the sole purpose of organizing a drug transaction.  Additionally,

8   during a search of the information displayed on the public profile page of Subject

9   Account 6, I looked at the friend list and compared it to the other Subject Accounts'

10  friend lists.  I found that the accounts all had multiple friends in common, and among the

11  common friends were accounts that had been in contact with Subject Account 1 for the

12  purposes of organizing suspected drug transactions.  I believe CASTRO used Subject

13  Account 6 to organize suspected drug transactions.

14  ***Federal Search Warrant for Subject Accounts 1 Through 6***

15          82.     On March 8, 2018, I obtained a search warrant from the United States

16  District Court for the Western District of Washington for Subject Accounts 1 through 6,

17  all of which I believe to be used by CASTRO in order to network and facilitate suspected

18  drug transactions.  On March 29, 2018, during a search of the Facebook Messenger

19  portion of Subject Accounts 1 through 3 and 5 through 6 of the returned warrant

20  materials, I found numerous suspected drug conversations between CASTRO and

21  individuals whom agents believe are his drug customers.  Furthermore, during a search of

22  the "Cookies" portion of Subject Accounts 3 and 6, I found SUBJECT ACCOUNT 7

23  listed as an account that was accessed by the same electronic device and under the same

24  "cookie" as the aforementioned accounts.

25

26

27

28

AFFIDAVIT OF SAMUEL T. LANIDS - 30

83.     When I looked at SUBJECT ACCOUT 7's friends list and compared it to the other Subject Accounts' friend lists (with the exception of Subject Account 4),[4] I found that the accounts all had multiple friends in common. Among the common friends were accounts that had been in contact with Subject Account 1, Subject Account 5, and Subject Account 6 for the purposes of organizing suspected drug transactions.

***CASTRO Uses SUBJECT ACCOUNT 7 to Contact the CS***

84.     On April 9, 2018, CASTRO contacted the CS using SUBJECT ACCOUNT 7 to have the CS register a white 2008 Honda Accord (TV3) in Washington in exchange for "stuff," or what I believe to be heroin.  The following conversation took place between CASTRO and the CS on Facebook Messenger using SUBJECT ACCOUNT 7:

- CASTRO: "good morning"
- CASTRO: "some places at DMV is open today…"
- CS: "I have work in 2 hours"
- CASTRO: "you can make this now?"
- CASTRO: "he can go to him"
- CS: "i cant we need to tomorrow"
- CASTRO: "tomorrow?"
- CS: "yes"
- CASTRO: [Thumbs up graphic]
- CASTRO: "but early, ok?"
- CS: "ok"
- CS: "how early?"
- CASTRO: "9am"
- CS: "at 13133 Bel-Red Road Bellevue, WA 98005"
- CS: "is ok?"

---

[4] According to the Facebook Law Enforcement Response Team, my historical data request for Subject Account 4 could not be processed because Subject Account 4 no longer existed.

AFFIDAVIT OF SAMUEL T. LANIDS - 31

1  •  CASTRO: "9am?"

2  •  CASTRO: "9am at this address?"

3  •  CASTRO: "wish documents you will need"

4  •  CS: "title and registration i think"

5  •  CS: "whatever the brought last time worked"

6  •  CASTRO: "the current plates?"

7  •  CS: "i think they are you to keep or trash"

8  •  CASTRO: "ok"

9  •  CASTRO: "you will want cash or stuff?"

10  •  CS: "stuff is fine"

11  •  CASTRO: "9am?"

12  •  CS: "you want insurance also"

13  •  CS: "we can look up cost to register it online maybe do you have the car

14     info"

15  •  CASTRO: "yes"

16  •  CS: "can you send a picture for the info or type it I willl ook it up"

17  •  CS: "look up how much it will cost"

18  •  CASTRO: "Honda Accord 2008"

19  •  CS: "ok see him at 9:00"

20  •  CASTRO: "ok, you phone number is the same?"

21  •  CS: "[XXXX]"[5]

22  •  CS: [Thumbs up graphic]

23  •  CASTRO: "ok"

24  •  CASTRO: [Thumbs up graphic]

25  •  CS: "we might need emission test again"

26

27  _____

28  [5] Although the CS's phone number was included and is known to me, I have redacted it for purposes of this
Affidavit.

AFFIDAVIT OF SAMUEL T. LANIDS - 32

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

- CASTRO: "ok"
- CS: "ok i gtg to work [smiley face emoticon] have a good day amigo"
- CASTRO: "I will send text to you tomorrow morning [2 smiley face with sunglasses emoticons]"
- CASTRO: [Thumbs up graphic]
- CS: "im working very hard to make life good if you have extra ways to make money or stuff let me know for sure this is so much help thank you"

85.    During the morning hours of April 10, 2018, Det. Ejde and Sergeant Billy Renfro met with the CS at a secure meeting location and searched the CS for any contraband items, finding none.  CASTRO contacted the CS using SUBJECT ACCOUNT 7 to finalize what they had planned the following day, i.e., the CS's assistance in registering the white 2008 Honda Accord (TV3).  The following conversation took place over Facebook Messenger using SUBJECT ACCOUNT 7 on April 10, 2018, at 7:55 a.m.:

- CASTRO: "good morning…you're ready to go?"
- CASTRO: "$900 on stuff, ok?"
- CASTRO: "you said $800 cash, but you want stuuf…this is 20gr"
- CASTRO: [Thinking emoticon]
- CS: "ok"
- CS: "And he will pay for registration correct?"
- CASTRO: "yes, everything"
- CS: [Thumbs up graphic]
- CASTRO: [Thumbs up graphic]

86.    At approximately 8:00 a.m., the CS reinitiated contact with SUBJECT ACCOUNT 7 and the conversation was as follows:

- CS: "I'll be there soon wearing this"
- CASTRO: "ok, my cousins just now left Kent house"

AFFIDAVIT OF SAMUEL T. LANIDS - 33

1          • CASTRO: "2534786098 Carlos…this the phone number of my

2             cousin…him will call to you"

3      87.   At 9:32 a.m., the conversation continued, as CASTRO messaged the CS

4  using SUBJECT ACCOUNT 7:

5          • CASTRO: "he says that you not answer"

6          • CASTRO: "he is there waiting for you"

7          • CASTRO: "where you are?"

8          • CS: "This bus took me somewhere else I'm trying to get over there on the

9             right direction"

10     88.   CASTRO called the CS using SUBJECT ACCOUNT 7, however, the CS

11 did not answer.  CASTRO then resumed the Facebook Messenger conversation, using

12 SUBJECT ACCOUNT 7, as follows:

13         • CASTRO: "how long?"

14         • CS: "I got on the wrong side of the street I will have to go back the other

15            way I'm so sorry I will be half hour about."

16         • CASTRO: "send me your address, him will go to you for ride"

17         • CASTRO: "we need this very fast, him have people waiting at Auburn for

18            business."

19         • CS: "at the bus stop it will take me there"

20         • CASTRO: "yes, but send me the address please"

21     89.   CASTRO again tried to call the CS using SUBJECT ACCOUNT 7,

22 however, the CS did not answer.  CASTRO then resumed the Facebook Messenger

23 conversation, using SUBJECT ACCOUNT 7, as follows:

24         • CASTRO: "??"

25         • CASTRO: "hey"

26         • CASTRO: [Angry emoticon]

27         • CASTRO: "amigo"

28

AFFIDAVIT OF SAMUEL T. LANIDS - 34

1        • CS: [Thinking emoticon]

2        90.     CASTRO again tried to call the CS using SUBJECT ACCOUNT 7,

3   however, the CS did not answer.  CASTRO then resumed the Facebook Messenger

4   conversation, using SUBJECT ACCOUNT 7, as follows:

5        • CS: "I'm in the right way for sure now"

6        • CASTRO: "he says is calling to you, but you not answer to him."

7        • CS: "The WiFI is terrible on the bus"

8        • CASTRO: "I called to you old phone number, but somebody fiel answer

9            me…"

10       • CASTRO: "you only can answer with wifi?"

11       • CS: "I was at Starbucks waiting earlier"

12       • CS: "When the buys is moving WiFi is bad"

13       • CASTRO: "Ok"

14       • CASTRO: "how long?"

15       • CS: "My old number? I only have [XXX]"[6]

16       • CS: "5 minutes"

17       • CASTRO: "ok"

18       91.     During this messaging exchange, agents on surveillance at the licensing

19   office (located at 15600 Northeast 8th Street at the Bellevue Crossroads Mall) did not see

20   any of the known target vehicles in this investigation nor did they see a Honda Accord

21   with Arizona license plates.  Agents suspected CASTRO's associates might have been at

22   a different licensing office in Bellevue (13133 Bel-Red Road, based on the CS's prior

23   conversations with CASTRO).  At about 10:00 a.m., agents brought the CS to the

24   licensing office at the Crossroads Mall and maintained constant surveillance of the CS

25   from that point onward.  Agents outfitted the CS with a recording/transmitting device

26

27   _____

28   [6] Although the CS's phone number was included and is known to me, I have redacted it for purposes of this
     Affidavit.

AFFIDAVIT OF SAMUEL T. LANIDS - 35

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   (EMD) once he/she was in place at the Crossroads Mall.  At 10:17 a.m., the CS

2   electronically shared his/her location with CASTRO and continued his/her messaging

3   conversation with CASTRO using SUJBECT ACCOUNT 7:

- CS: "At bei-red auto liscence"

- CASTRO: "where you are exactly?"

- CASTRO: "you're inside?"

- CS: "I stepped outside to look for him I'm there still"

- CASTRO: "wait outside, just at the door please."

- CS: [Thumbs up graphic]

- CS: "He is not here?"

- CATRO: "yes, he is finding to you"

- CASTRO: "13133 Bel-Red Road Bellevue, WA 98005"

- CASTRO: "yesterday you sent to me this address"

- CASTRO: "my cousin is at this address."

- CASTRO: "you're at different address.."

- CS: "I think that one only does drivers liscence not register title"

- CASTRO: "ok, he is in way to you. Wait there please"

- CS: [Thumbs up graphic]

92.   At approximately 10:35 a.m., agents saw FRIAS and a male later identified

as Juan Jose HIGUERA Gonzalez arrive at the Bel-Red Auto Licensing driving TV1 and

a 2008 Honda Accord bearing Arizona license plate CFE0457.  Agents then saw FRIAS

and HIGUERA meeting with the CS before all three went inside Bel-Red Auto

Licensing.  Shortly before finishing the registration process, the CS messaged SUBJECT

ACCOUNT 7 to let CASTRO know about the details of the registration process.  Their

conversation was as follows:

- CS: "sorry for the mix up I am so tired all the time from working too much"

- CS: "We are almost done what about the red light ticket tho"

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1

- CASTRO: "him have the money for pay it"

2

- CS: "ok"

3

- CS: "124$"

4

- CS sends a picture of the previously mentioned traffic infraction.

5

- CASTRO: "yes"

6

- CASTRO: "you can pay there?"

7

- CS: "Ok should I show him this or you can tell him"

8

- CS: "yes we are getting the plates now"

9

- CASTRO: "I will talk to him now"

10

- CASTRO: "thanks my friend"

11

12      93.      While listening to the EMD, I was able to confirm that the CS was

obtaining insurance for the Honda. After this was done, the CS, FRIAS, and HIGUERA

13

ate a meal at the mall's food court. At 12:15 p.m., the three subjects finished their meal

14

and walked back to TV1 and the Honda Accord that originally bore Arizona license plate

15

CFE0457; after its registration in Washington as detailed herein, now bears Washington

16

license plate BJN4395 (Target Vehicle 3, or TV3). Before parting ways, FRIAS,

17

HIGUERA and the CS briefly met near TV1, where FRIAS provided the CS with

18

approximately 20 grams of suspected heroin. According the CS, FRIAS grabbed the

19

suspected heroin from the center console of TV1.

20      94.      The CS met with SA DelVecchio and Det. Ejde at a secure location and

21

provided them with the 20 grams of suspected heroin. SA DelVecchio and Det. Ejde

22

searched the CS for contraband items and did not find any items during that search. The

23

CS later told SA DelVecchio and Det. Ejde that FRIAS supplied the CS with the

24

suspected heroin as the CS's "payment" for taking care of the vehicle registration and

25

insurance, as the CS and CASTRO had discussed on April 9, 2018.

26      95.      At 1:00 p.m., CASTRO briefly reinitiated contact with the CS using

27

SUBJECT ACCOUNT 7 and the conversation was as follows:

28

AFFIDAVIT OF SAMUEL T. LANIDS - 37

UNITED STATES ATTORNEY
1201 Pacific Avenue, Suite 700
Tacoma, Washington 98402
(253) 428-3800

- CASTRO: "you talked to him? he said not understand"
- CASTRO: "everything is ok?"
- CS: "Ya I was wondering if this is the highest quality I remember you had 3 different ones"
- CASTRO: "yes, is the best for you…"
- CS: [Thumbs up graphic]
- CASTRO: "$1150 for 25gr…"
- CS: "perfect"
- CASTRO: "sell that, do not consume it."
- CASTRO: "I definitely don't want to I have someone to sell it all to at once"

**INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

96.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular Title 18, United States Code, Sections 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

97.     As indicated in the Motion for Nondisclosure and Motion to Seal that accompany this Affidavit, the government requests, pursuant to the preclusion of notice provisions of Title 18, United States Code, Section 2705(b), that Facebook be ordered not to notify any person (including the subscriber or customer to which the materials relate) of the existence of this warrant for such period as the Court deems appropriate.  The government submits that such an order is justified because notification of the existence of this Order would seriously jeopardize the ongoing investigation.  Such a disclosure would give the subscriber an opportunity to destroy evidence, change patterns of behavior,

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    notify confederates, or flee from prosecution.  Notifying our targets of the existence of
2    this investigation will likely cause them to destroy evidence, flee the jurisdiction, or alter
3    their methods, thus making it more difficult to dismantle the organization effectively.
4    Notice also could put the CS, UC, and agents working with them in danger

5         98.     It is further respectfully requested that this Court issue an order sealing all
6    papers submitted in support of this application, including the application and search
7    warrant, until such dates as provided in the proposed Order.  I believe that sealing this
8    document is necessary because the items and information to be seized are relevant to an
9    ongoing investigation.  Premature disclosure of the contents of this Affidavit and related
10   documents may have a significant and negative impact on the continuing investigation
11   and may severely jeopardize its effectiveness.

12              **COMMON CHARACTERISTICS OF DRUG TRAFFICKERS**

13        99.     Based on my training and experience, including experience obtained
14   through participation in this and other investigations involving the distribution of
15   controlled substances, including those targeting long-term conspiracies responsible for
16   the distribution of controlled substances, and based upon my consultation with other
17   experienced law enforcement agents and officers, I know that:

18        a.     Drug trafficking conspiracies, especially those involving large amounts of
19   narcotics and interstate shipments, usually take place over several months or years, and
20   continue to operate even when enforcement activity results in arrests and/or seizures of
21   drugs and/or money.

22        b.     Those involved in the distribution of illicit drugs often communicate by
23   telephone in connection with their illegal activities in order to set up meetings with
24   coconspirators, conduct drug transactions, or to arrange for the transportation drugs or
25   drug proceeds.

26
27
28

AFFIDAVIT OF SAMUEL T. LANIDS - 39

1

## CONCLUSION

2      100.    Based upon the information which has been uncovered during the course of

3  this investigation, and on the advice, experience, knowledge of other agents and officers

4  involved in this investigation, I believe these facts establish probable cause to conclude

5  that SUBJECT ACCOUNT 7 has been used, and will continue to be used, to facilitate

6  violations of the Controlled Substances Act, specifically distribution of narcotics,

7  conspiracy, and related offenses in the Western District of Washington, and elsewhere, in

8  violation of the Controlled Substances Act, Title 21, United States Code, Sections 841

9  and 846.

10

11                          SAMUEL T. LANDIS,

12                          Special Agent

13                          Drug Enforcement Administration

14

15  Subscribed and sworn to before me this _19th_ day of April, 2018.

16

17

18  J. RICHARD CREATURA

19  UNITED STATES MAGISTRATE JUDGE

20

21

22

23

24

25

26

27

28

AFFIDAVIT OF SAMUEL T. LANIDS - 40

1

## ATTACHMENT A

2

### Property to Be Searched

3      This warrant applies to information associated with the following account,

4  identified by Facebook user ID: gina.morris.714655 ("SUBJECT ACCOUNT 7"), for all

5  such information that is stored at premises owned, maintained, controlled, or operated by

6  Facebook, a company headquartered in Menlo Park, California.  This warrant is limited

7  to information created after June 16, 2016.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AFFIDAVIT OF SAMUEL T. LANIDS - 41

## ATTACHMENT B

### Particular Things to be Seized

**I.     Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under Title 18, United States Code, Section 2703(f), Facebook is required to disclose the following information to the government for the user IDs listed in Attachment A ("SUBJECT ACCOUNT 7"):

A.  The following information about the customer or subscriber of SUBJECT ACCOUNT 7:

    (a)   All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

    (b)   All activity log for SUBJECT ACCOUNT 7, and all other documents showing the user's posts and other Facebook activities;

    (c)   All photos and videos in their original format, including EXIF information (metadata), uploaded by that user ID and all photos and videos in their original format, including EXIF information (metadata), uploaded by any user that have that user tagged in them;

    (d)   All other records of communications and messages made or received by the user, including all private messages, chat history, calling history, and pending "Friend" requests;

    (e)   All "check ins" and other location information;

    (f)   All IP logs, including all records of the IP addresses that logged into SUBJECT ACCOUNT 7;

AFFIDAVIT OF SAMUEL T. LANIDS - 42

1    (g)    All past and present lists of friends created by SUBJECT ACCOUNT 7;

2    (h)    All records of Facebook searches performed by SUBJECT ACCOUNT 7;

3    (i)    The length of service (including start date);

4    (j)    The means and source of payment for such service (including any credit
5    card or bank account number) and billing records;

6    (k)    All records pertaining to communications between Facebook and any
7    person regarding the user or the user's Facebook account, including
8    contacts with support services and records of actions taken;

9    (l)    Names (including subscriber names, Facebook user IDs, and screen
10    names);

11    (m)    Addresses (including mailing addresses, residential addresses, business
12    addresses, and e-mail addresses);

13    (n)    Local and long distance telephone connection records;

14    (o)    Linked accounts; and

15    (p)    Telephone or instrument numbers or identities (including MAC addresses).

16  B.  All records and other information (not including the contents of communications)
17    relating to SUBJECT ACCOUNT 7, including:

18    (a)    Records of user activity for each connection activity for each connection
19    made to or from SUBJECT ACCOUNT 7, including log files; messaging
20    logs; the date, time, length, and method of connections; data transfer
21    volume; user names; and source and destination of Internet Protocol
22    addresses;

23    (b)    Information about each communication sent or received by SUBJECT
24    ACCOUNT 7, including the date and time of the communication, the
25    method of the communication (such as source and destination email
26    addresses, IP addresses, and telephone numbers); and

27    (c)    Records of any Facebook accounts that are linked to SUBJECT
28    ACCOUNT 7 by machine cookies (meaning all Facebook user IDs that

AFFIDAVIT OF SAMUEL T. LANIDS - 43

1      logged into Facebook by the same machine or device as SUBJECT

2      ACCOUNT 7).

3 **II.    Information to be seized by the government**

4      All information described above in Section I that relates to the ongoing narcotics

5 investigation described in the Affidavit, including, for the user ID identified on

6 Attachment A1, information pertaining to the following matters:

7      (a) Any content including e-mails, messages, texts, photographs (including

8          metadata), videos (including metadata), visual images, documents,

9          spreadsheets, address lists, contact lists or communications of any type

10          which could be used to identify the user and or their location.

11      (b) Records relating to who created, used, or communicated with the user ID,

12          including records about their identities and whereabouts.

13      (c) All subscriber records associated with SUBJECT ACCOUNT 7, including

14          names, addresses, local and long distance telephone connection records, or

15          records of session times and durations, length of service (including start

16          date) and types of service utilized, telephone or instrument number or other

17          subscriber number or identity, including any temporarily assigned network

18          address, and means and source of payment for such service including any

19          credit card or bank account number.

20      (d) Any and all other log records, including IP address captures, associated

21          with SUBJECT ACCOUNT 7; and

22      (e) Any records of communications between Facebook and any person about

23          issues relating to the account, such as technical problems, billing inquiries,

24          or complaints from other users about SUBJECT ACCOUNT 7.  This is to

25          include records of contacts between the subscriber and the provider's

26          support services, as well as records of any actions taken by the provider or

27          subscriber as a result of the communications.

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800